No. 25-60278

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

## BARBIE BASSETT,

*Plaintiff - Appellant*

## VERSUS

## GRAY MEDIA GROUP, INCORPORATED, doing business as WLBT-TV,

*Defendant - Appellee*

_____

## BRIEF OF APPELLANT

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

Honorable Judge Daniel P. Jordan, III, United States District Judge

JIM WAIDE, MS Bar No. 6857
waide@waidelaw.com
RACHEL PIERCE WAIDE, MS Bar No. 100420
rpierce@waidelaw.com
YANCE FALKNER, MS Bar No. 106107
yfalkner@waidelaw.com
WAIDE & ASSOCIATES, P.A.
Post Office Box 1357
Tupelo, MS 38802-1357
(662) 842-7324 / Telephone
(662) 842-8056 / Facsimile

ATTORNEYS FOR PLAINTIFF-APPELLANT

No. 25-60278

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

### BARBIE BASSETT,

*Plaintiff - Appellant*

### VERSUS

### GRAY MEDIA GROUP, INCORPORATED, doing business as WLBT-TV,

*Defendant - Appellee*

_____

## CERTIFICATE OF INTERESTED PARTIES

_____

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of FIFTH CIRCUIT RULE 28.2.1 have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

1.    Barbie Bassett, Plaintiff-Appellant;

2.    Jim Waide, counsel for Plaintiff-Appellant;

3.    Rachel Pierce Waide, counsel for Plaintiff-Appellant;

4.    Yance Falkner, counsel for Plaintiff-Appellant;

5.    Waide & Associates, P.A., counsel for Plaintiff-Appellant;

6.    Gray Media Group, Incorporated, doing business as WLBT-TV, Defendant-Appellee;

7.    Melissa Kimberly Hodges, counsel for Defendant-Appellee; and

8.    Ogletree Deakins, P.C., counsel for Defendant-Appellee.

SO CERTIFIED, this 3rd day of September, 2025.

*/s/Jim Waide*
JIM WAIDE
Counsel for Plaintiff-Appellant

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

This case presents the issue of whether the burden shifting methodology of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is the sole way a plaintiff may prove employment discrimination or whether a plaintiff must simply present evidence from which a reasonable jury could infer that race was a factor in the decision to terminate her.  The district court erred in mechanically applying *McDonnell Douglas* and dismissed a case with clear questions of material fact.  This is an issue of vast importance and one which warrants oral argument.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PARTIES .......................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ............................................... iv

TABLE OF CONTENTS ................................................................................... v

TABLE OF AUTHORITIES ............................................................................. vi

STATEMENT OF JURISDICTION .................................................................... x

STATEMENT OF THE ISSUES ....................................................................... xi

CONCISE STATEMENT OF THE CASE ............................................................ 1

FACTUAL BACKGROUND ............................................................................ 1

STANDARD OF REVIEW .............................................................................. 8

SUMMARY OF THE ARGUMENTS .................................................................. 9

ARGUMENTS ............................................................................................ 11

    I. **THERE ARE ISSUES OF MATERIAL FACT AS TO WHETHER BASSETT WAS DISCRIMINATED AGAINST BECAUSE OF HER RACE, WHITE** ................................................................... 11

    II. **THE DISTRICT COURT ERRED IN HOLDING THAT THE *MCDONNELL DOUGLAS* METHOD WAS THE EXCLUSIVE METHOD OF PROVING RACE DISCRIMINATION** ....................... 24

    III. **ALTERNATIVELY, EVEN USING THE *MCDONNELL DOUGLAS* METHOD, A JURY ISSUE WAS PRESENTED** .................................. 32

CONCLUSION ........................................................................................... 36

CERTIFICATE OF SERVICE .......................................................................... 37

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS .......... 38

# TABLE OF AUTHORITIES

## Federal Court Cases

*Ames v. Ohio Department of Youth Services*, 605 U.S. 303 (2025) ........................33

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......................................9, 19

*Babb v. Wilkie*, 589 U.S. 399 (2020) .......................................................15

*Bart v. Golub Corporation*, 96 F.4th 566 (2d Cir. 2024) .........................................28

*Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020) ...........................passim

*Brady v. Office of Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008)................28, 29

*Brandt v. Fitzpatrick*, 957 F.3d 67 (1st Cir. 2020)...................................................27

*Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222 (5th Cir. 2015).................19

*City of Los Angeles, Dept. of Water and Power v. Manhart*,
    435 U.S. 702 (1978)........................................................................15

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).....................................25, 26, 27

*EEOC v. Rite Way Serv.,* 819 F.3d 235, 239 (5th Cir. 2016) ..................................12

*Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*,
    778 F.3d 473 (5th Cir. 2015)..................................................................24, 25

*Furnco Const. Corp. v. Waters*, 438 U.S. 567 (1978).............................................11

*Hittle v. City of Stockton, California*, 604 U.S. ----, 145 S.Ct. 759 (2025) .............29

*McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273 (1976).......................30, 33

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)..............................passim

*Murray v. UBS Securities, LLC,* 601 U.S. 23 (2024)..............................................15

*Nunez v. Superior Oil Co.*, 572 F.2d 1119 (5th Cir. 1978)..........................................9

*Owens v. Circassia Pharms., Inc.,* 33 F.4th 814, 826 (5th Cir. 2022) ...................11

*Patterson v. McLean Credit Union*, 491 U.S. 164 (1989) .......................................28

*Portis v. First Nat'l Bank*, 34 F.3d 325 (5th Cir. 1994) ...........................................24

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) .................................................14

*Quigg v. Thomas County School Dist.*, 814 F.3d 1227 (11th Cir. 2016) ................27

*Rachid v. Jack In The Box, Inc.*, 376 F.3d. 305, (5th Cir. 2004).............................27

*Reeves v. Sanderson Plumbing Products, Inc.*,
    530 U.S. 133 (2000)............................................................................... passim

*Russell v. McKinney Hosp. Venture*, 235 F.3d 219 (5th Cir. 2000)........................24

*Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893 (5th Cir. 2002) ..........................24

*Securities and Exchange Commission v. Jarkesy*, 603 U.S. 109 (2024) ................35

*Sioux City & P. R. Co. v. Stout*, 84 U.S. 657 (1873) ..................................................9

*Stelly v. Department of Public Safety and Corrections Louisiana State*,
    No. 24-30550, 2025 WL 2371031 (5th Cir. Aug. 15, 2025) ........................35

*Students for Fair Admissions, Inc. v. President and Fellows of
    Harvard College*, 600 U.S. 181 (2023) .......................................................22

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981) ................11, 33

*Tolan v. Cotton*, - U.S. -, 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014) .............19

*Tynes v. Florida Department of Juvenile Justice*, 88 F.4th 939
    (11th Cir. 2023)..............................................................................................29

*U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711 (1983)........11, 28, 29

*Vessels v. Atlanta Independent School System*, 408 F.3d 763 (11th Cir. 2005) .......29

*Walton v. Powell,* 821 F.3d 1204 (10th Cir. 2016) ..............................................9, 30

*Wilson v. Belmont Homes, Inc.*, 970 F.2d 53 (5th Cir. 1992)............................34, 35

*Young v. City of Houston, Tex.*, 906 F.2d 177 (5th Cir. 1990)................................34

## Statutes and Rules

28 U.S.C. § 1291 ...................................................................................................x

28 U.S.C. § 1331 ...................................................................................................x

28 U.S.C. § 1343 ...................................................................................................x

42 U.S.C. § 2000e(c)............................................................................................35

42 U.S.C. § 2000e(m) ..........................................................................................27

42 U.S.C. § 2000e(2) ............................................................................................x

42 U.S.C. § 2000e-2(a)(1)....................................................................................14

42 U.S.C. § 2000e-2(m)..............................................................................10, 14, 25

42 U.S.C. § 2000e-5(g)(2)(B).............................................................................15

## Miscellaneous

Deborah A. Widiss, *Proving Discrimination by the Text*,
106 Minn. L. Rev. 353 (2021) ......................................................................31

Edward H. Cooper, *Directions for Directed Verdicts: A Compass for Federal
Courts*, 55 Minn. L. Rev. 903 (1970) ....................................................19, 20

Katie Eyer, *The Return of the Technical McDonnell Douglas Paradigm*,
94 Wash. L. Rev. 967 (2019) ..................................................................31, 32

Lewis Carroll, *Through the Looking-Glass* ...........................................................22

Sandra F. Sperino, *Flying Without a Statutory Basis: Why McDonnell Douglas Is Not Justified by Any Statutory Construction Methodology*, 43 Hou. L. R, 743 (2006)...............................................................................32

Timothy M. Tymkovich, *The Problem of Pretext*, 85 Denv. U. L. Rev. 503 (2008) ...........................................................................................31

## <u>STATEMENT OF JURISDICTION</u>

The district court had federal question jurisdiction under 28 U.S.C. § 1331, and civil rights jurisdiction under 28 U.S.C. § 1343, for a cause of action arising under the Civil Rights Act of 1964, 42 U.S.C. § 2000e(2). This Court has jurisdiction over the appeal from the final judgment of the district court, pursuant to 28 U.S.C. § 1291. The district court's final judgment was filed on May 19, 2025. ROA. 1144; R.E. 3. The Notice of Appeal was timely filed on May 20, 2025. ROA. 1145-1146; R.E. 4.

# STATEMENT OF THE ISSUES

1.      Are there issues of material fact as to whether race was a motivating factor in Bassett's termination?

2.      Is the burden shifting methodology of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the exclusive way in which a plaintiff may prove discrimination under Title VII of the Civil Rights Act of 1964?

3.      If the *McDonnell Douglas* methodology must be used, did Bassett present a jury issue utilizing that methodology?

## CONCISE STATEMENT OF THE CASE

In a complaint filed in the United States District Court for the Southern District of Mississippi, Plaintiff Barbie Bassett alleged, *inter alia*, that her race, white, caused her to be fired as an on-air news anchor by Defendant Gray Media Group, Inc. d/b/a WLBT-TV.  ROA. 9-27.[1]

On May 19, 2025, the district court granted summary judgment in favor of WLBT.  ROA. 1123-1144.

Bassett timely filed her Notice of Appeal on May 20, 2025.  ROA. 1145-1146.

## FACTUAL BACKGROUND

### A.    Barbie Bassett's Background.

Barbie Bassett is a white female.  Bassett obtained her Bachelor of Science in mass communication from Mississippi College in Clinton, Mississippi.  ROA. 542-543.  Bassett then earned a Master of Science degree in geosciences with a concentration in broadcast meteorology from Mississippi State University in Starkville, Mississippi.  ROA. 542-543, 563.  Bassett did post graduate training at Portland State University in Portland, Oregon.  ROA. 542-543.

Bassett, her husband William, and their three (3) children make their home in Madison, Mississippi, where they have resided for approximately thirty (30) years.  ROA. 551-552.

---

[1]  Bassett also asked the district court to declare her noncompete agreement void.  ROA. 9-27.

### B.    Barbie Bassett's Employment History with WLBT.

Bassett began her employment with WLBT in September 1999. ROA. 542-543, 566. Bassett worked at WLBT as a morning news anchor, morning news producer, general assignment reporter, and fill-in meteorologist from September 1999 until October 2003, when she was promoted to chief meteorologist and Midday Mississippi co-anchor. ROA. 542-543, 567-568.

Bassett worked at WLBT as chief meteorologist and Midday Mississippi co-anchor from the fall of 2003 through May 2013. ROA. 542-543. In June 2013, Bassett's work at WLBT transitioned into a freelance meteorologist, on-air special projects talent, and skycopter traffic reporter. ROA. 542-543. In December 2019, Bassett returned to WLBT fulltime as the morning news traffic reporter and the co-host of Today at 11. ROA. 542-543.

On September 29, 2021, Bassett signed a new employment contract with WLBT. ROA. 704-711. From early October 2021 until her termination in March 2023, Bassett served as both morning news anchor and co-host of Today at 11. ROA. 542-543, 569, 576.

When asked to describe Bassett's work at the television station, Maggie Wade-Dixon, black, another anchor at WLBT, said, "Hard worker. Dedicated. Loved what she did. Always loved what she did." ROA. 724. When questioned about Bassett's

interaction with viewers, Maggie Wade-Dixon replied, "Friendly, warm, loving, and grateful."  ROA. 725.

Michael White, black, director of operations for the Gray Media Training Center at WLBT, testified that Bassett was "a great anchor" who "was professional on television."  ROA. 778.

Charles Jones, white, news director at WLBT, testified that Bassett was "well connected to the community and just relatable."  ROA. 799.

### C.    Barbie Bassett's Initial Disciplinary Notice from Gray Media for Saying "Grand Mammy" on Air.

On October 28, 2022, Bassett engaged in on-air banter with WLBT reporter Carmen Poe, black, who was reporting on ESPN's GameDay at Jackson State University.  ROA. 875-876.  Poe was on campus at Jackson State to cover the presence of ESPN's pre-game show, and the WLBT anchors were bantering about the identity of the surprise GameDay picker.

On air, Bassett told Poe that she should ask her "grand mammy" to get a chocolate pie or pecan pie at Kroger and "see if you could coax the Gameday people . . ." to tell Poe who the GameDay celebrity was going to be.  ROA. 590.

Initially, Charles Jones, white, WLBT's news director, was "not familiar with the term [grand mammy] at all."  ROA. 815.  However, Jones later received an email complaining about Bassett's using the term "grand mammy."  ROA. 809. Subsequently, there was a slow influx of viewer complaints that Bassett had said

"grand mammy." ROA. 810-811. The viewer response was along racial lines, with black viewers being angry about the use of the term, and white viewers supporting Bassett and opposing any reprimand of her. ROA. 824-825.

Ultimately, Jones told Bassett that the use of the term was inappropriate because it had a "history of a disrespectful connotation to a large group of people." ROA. 815.

Bassett explained that when she said "grand mammy" she knew of no racist meaning of the term. In fact, she called her own grandmother, "grand mammy," and would "never call my own grandmother a racially sensitive word." ROA. 595.

When Bassett learned the term was offensive to black viewers, she immediately called Poe to apologize. ROA. 596. She told her co-worker and friend, Maggie Wade-Dixon, that she was "heartbroken" to learn that this word was offensive to some people. ROA. 597. Bassett also told management that she wanted to apologize for the use of the term. ROA. 599.

Ultimately, WLBT aired an apology because Bassett used the term "grand mammy," and Bassett continued her work at the station. ROA. 606-607, 875-876.

**D.    Barbie Bassett Is Terminated for Saying "Fo Shizzle, My Nizzle."**

"Snoop Dogg" is a popular black artist. ROA. 622.

On May 8, 2023, Bassett was reading a story from the teleprompter about Snoop Dogg's marketing a new wine. ROA. 619. After reading the story on air,

Bassett and her co-anchor, Wilson Stribling, white, bantered about Snoop Dogg and his new wine. In the course of this conversation, Bassett said, "Fo shizzle, my nizzle," quoting Snoop Dogg's famous tag line. ROA. 619-620.

At a commercial break, a black anchor, Patrick Ellis, told Bassett that he could not believe she used the "N" word on television. ROA. 621. Bassett told Ellis she did not use the "N" word and told Ellis that the phrase "fo shizzle, my nizzle" means "for real, my friend" or "for real, my brother." ROA. 621.

Wilson Stribling, the white co-anchor on the set at the time, agreed with Bassett, that the phrase "fo shizzle, my nizzle," did not contain the "N" word. ROA. 621.

White news director, Jones, testified that he had never heard the phrase "fo shizzle, my nizzle," and did not know what the words meant. ROA. 833. Jones looked up the phrase and found various meanings, including the same "for real, my brother" meaning about which Bassett had spoken. ROA. 833-834. Jones explained, though, that despite his own research regarding the phrase and his finding various meanings, two (2) black WLBT employees who worked in master control told him that the phrase meant "my nigga." ROA. 833, 836.

Like Jones, general manager Ted Fortenberry, white, also did not know what the phrase "fo shizzle, my nizzle" meant. ROA. 904. Unlike Jones, Fortenberry never looked up the meaning of the term "fo shizzle, my nizzle." Instead Fortenberry

accepted the definition that Pam Confer, black, who worked as a consultant for WLBT, provided to him.  ROA. 901-902, 904.

Fortenberry discussed Bassett's saying "fo shizzle, my nizzle" with Jones, with human resources director Sharel Bend, black, and with in house counsel for WLBT, Will Joslin, white. ROA.  906-911.  Fortenberry never asked Bassett herself what she believed the phrase meant.  ROA. 908.

Bend told Jones, Fortenberry, and Joslin, that the phrase "fo shizzle, my nizzle" includes the "N" word.  ROA. 976.  Bend claimed that Snoop Dogg uses the term as a "derogatory comment," although she admitted that an internet search disclosed alternate, non-discriminatory meanings for the term.  ROA. 976-977.

Fortenberry claimed that the group decided to fire Bassett.  ROA. 911.  Both Jones and Bend, however, testified that the decision to terminate was made by Fortenberry alone.  ROA. 840, 957.

At the time the decision was made to terminate Bassett, WLBT had heard the opinions of Patrick Ellis, black anchor; Pam Confer, black consultant; Sharel Bend, black human resources employee; and two (2) other black employees from master control.  All agreed that the phrase "fo shizzle, my nizzle" contains the "N" word. White management, Jones and Fortenberry, did not know the meaning of the word. No one contacted Snoop Dogg to learn what he means when he says "fo shizzle, my nizzle."  ROA. 833, 842, 902-904, 907-908.

Jones and Emily Caballero, assistant news director, met with Bassett to tell her that she was terminated.  ROA. 632, 843.  Jones told Bassett she could resign or be fired.  ROA. 633-634.

WLBT offered Bassett a severance package if she resigned and if she released all claims against the station.  ROA. 634.

Bassett declined to resign and was fired on March 14, 2023.  ROA. 635.

During her termination meeting, Bassett asked the station manager if WLBT planned to enforce the noncompete agreement which was part of her contract.  ROA. 847.

After some indecision about the matter, WLBT decided that it would enforce its noncompete agreement against Bassett.  ROA. 914.  WLBT contended it could enforce a noncompete agreement whether there was any cause for Bassett's termination or not.  ROA. 1020-1021.

At deposition, WLBT's attorney repeatedly questioned Bassett about whether or not she could "see a difference" between her use of the phrase "fo shizzle, my nizzle," and a black person's use of that same phrase.  ROA. 625, 630.  Defense counsel asked, "Do you think that if an African American had made those same comments, it would have been as offensive to the public?"  ROA. 642.

Consistent with the questioning of Bassett by WLBT's counsel, WLBT's corporate representative, Fortenberry, when asked about Snoop Dogg's use of his

famous phrase "fo shizzle, my nizzle," testified that there are "absolutely" some "things that black people can say that white people can't say." ROA. 1026.

### E.    Barbie Bassett's Replacement.

WLBT claimed that it first offered Bassett's position to a white person, but ultimately hired Samantha German, a black person, for the position. ROA. 858-859.

### F.    WLBT's Gray Media Training Center's Preference for Black Employees.

The Gray Media Training Center, located inside WLBT, educates students to work in the field of broadcast television in order to help these students land media jobs. ROA. 766.

Students who participate in the training center must be juniors or seniors at a university in Mississippi. ROA. 767. The program is entirely funded by Gray Media. ROA. 771. In fact, the entire purpose of the program is to help students of color learn about the television industry. ROA. 774. HBCU students always get preference for open spots. ROA. 774. Since the program was started, approximately seventy-five (75) students have been admitted, but only three (3) were not students of color. ROA. 775.

## STANDARD OF REVIEW

Under *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000), this Court is to consider the evidence in the light most favorable to the non-movant, draw inferences in her favor, and "disregard all evidence favorable to the moving

party that the jury is not required to believe." "[L]itigants are entitled to have the jury draw those inferences or conclusions that are appropriate grist for juries." *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir. 1978).

This Court should "assume[] that twelve men know more of the common affairs of life than does one man, that they can draw wiser and safer conclusions from admitted facts thus occurring than can a single judge." *Sioux City & P. R. Co. v. Stout*, 84 U.S. 657, 664 (1873). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The current overuse of summary judgment as a substitute for jury trials has been condemned by Judge (now Justice) Neil Gorsuch in *Walton v. Powell*, 821 F.3d 1204, 1212 (10th Cir. 2016), as follows:

> Yes, today motions practice, and especially summary judgment motions practice, seems to have assumed a place near the center of the legal universe: almost no one makes it to trial anymore. With that development surely comes a strong temptation to anoint summary judgment with unique significance and adorn it with special rules and procedures. But the truth is summary judgment was supposed to be that-summary. Not a maddening maze. Not a paper blizzard. Not a replacement for the trial as the preferred means for resolving disputes.

## SUMMARY OF THE ARGUMENTS

The district court erred in granting summary judgment in this case, by mechanically applying the *McDonnell Douglas Corp. v. Green* methodology. The proper test for permitting a jury resolution is whether a reasonable fact finder could

find that race "was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

A mechanical application of the *McDonnell Douglas Corp. v. Green* methodology is inappropriate in light of the Supreme Court's decision in *Bostock v. Clayton County, Georgia*, 590 U.S. 644, 658 (2020), which holds that an "employer who intentionally treats a person worse because of sex – such as by firing the person for actions or attributes it would tolerate in an individual of another sex – discriminates against that person in violation of Title VII." A reasonable jury could find that Bassett would have been treated differently had she been black because WLBT's own attorney asked questions implying that there were things that a black person could say that a white person could not, and because WLBT's corporate representative himself admitted, " . . . that there are things that some people can say that are not considered to be inappropriate based on who they are and their background compared to other people." ROA. 1026.

The district court should have accepted as true WLBT's admission that there are some things that a black person can say but which a white person cannot say. At a minimum, the district court should have permitted a jury to infer WLBT would not have taken adverse employment action against Bassett had she been black and used the phrase "fo shizzle, my nizzle."

Whether WLBT would have treated a black person differently, is an issue of the station's "state of mind." While a person's state of mind is difficult to determine, it is "as much a fact as the state of his digestion." *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983). *U.S. Postal Service Bd. of Governors* further explained:

> The "factual inquiry" in a Title VII case is "whether the defendant intentionally discriminated against the plaintiff." *Burdine, supra,* at 253, 101 S.Ct., at 1093. In other words, is "the employer . . . treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.' " *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), quoting *Int'l Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335, n. 15, 97 S.Ct. 1843, 1854, n. 15, 52 L.Ed.2d 396 (1977). The *prima facie* case method established in *McDonnell Douglas* was "never intended to be rigid, mechanized, or ritualistic."

*U.S. Postal Service Bd. of Governors,* 460 U.S. at 715.

## ARGUMENTS

## I. THERE ARE ISSUES OF MATERIAL FACT AS TO WHETHER BASSETT WAS DISCRIMINATED AGAINST BECAUSE OF HER RACE, WHITE.

The district court begins its opinion by correctly stating the standards for reviewing a motion for summary judgment. ROA. 1123-1143. For example, that court cites cases such as *Owens v. Circassia Pharms., Inc.,* 33 F.4th 814, 826 (5th Cir. 2022) for the proposition that courts, when ruling on motions for summary judgment, must view all the evidence in the light most favorable to the plaintiff. ROA. 1123. Similarly, the district court correctly notes that it "may not make

credibility determinations or weigh the evidence" as held by the United States Supreme Court in *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000), and goes on to explain that its duty is to "interpret all facts and draw all reasonable inferences in favor of the nonmovant." *EEOC v. Rite Way Serv.,* 819 F.3d 235, 239 (5th Cir. 2016).  ROA. 1125.  Here, of course, Bassett is the nonmovant.

Despite its clear articulation of the appropriate standard, the district court wholly failed to consider the evidence in the light most favorable to Bassett and, in fact, weighed the evidence and made credibility determinations, clearly usurping the role of the jury.

For example, when discussing one of Bassett's most persuasive pieces of evidence – Fortenberry's testimony that there are "absolutely" things black people can say that white people cannot say – the district court writes, "But the context of the answer matters."  ROA. 1133.

The district court goes on to cite WLBT's corporate representative's attempt to rehabilitate himself and offer a different answer.  The district court even writes, "Viewed in the light most favorable to Bassett, Fortenberry did agree there are things Black people can say in society that White people can't.  But when asked specifically about statements by his on-air professionals, he said neither may say them."  ROA. 1134.

In reality, a reasonable jury might have considered both responses by Fortenberry and simply believed his first answer was a direct admission that race was a factor in Bassett's firing and believed that Fortenberry's later responses were nothing more than his trying to hide his real motivation. Such a credibility determination was not for the district court when a witness gave conflicting testimony.

The district court again impermissibly substituted its judgment for that of the jury when it held, "A reasonable jury could not infer racial animus from these facts" in discussing that Bassett had only one other disciplinary incident in a nearly twenty-five (25) year career at WLBT. ROA. 1138.

Bassett had argued that terminating her employment after a long, successful career could create an inference of racial animus, especially when viewed in light of other facts, such as WLBT's openly running a program to help broadcasting students prepare for jobs and allowing almost no white students into the program; WLBT's inquiring of primarily black people what they thought the phrase "fo shizzle, my nizzle" meant and disregarding alternate meanings; WLBT's admitting that viewer complaints came from predominantly black audience members and that white viewers were angry that Bassett was reprimanded for the "grand mammy" comment; and WLBT's enforcing Bassett's noncompete, preventing her from working at a competitor station, while at the same time, arguing that she was offensive on air.

Perhaps more importantly, Bassett's other alleged "blemish" on her work record was using the term "grand mammy." ROA. 1138. That "blemish" was racially motivated, as well. The district court, however, summarily decided that no jury could review those facts and find Bassett's firing to be racially motivated. Such weighing of evidence and drawing of inferences was a task for the jury, not the district court.

The Civil Rights Act of 1964 provides, in part:

> It shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's race . . .

42 U.S.C. § 2000e-2(a)(1).

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), held that employment discrimination can be proved by establishing that the protected trait was one motivating factor in the decision, subject, however, to a defense that the employer would have fired the employee even had it not been for her protected trait.

*Price Waterhouse* was abrogated in part by the Civil Rights Act of 1991, which amended the Civil Rights Act of 1964, to provide, in part:

> Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race . . . was a motivating factor for any employment practice, even though other factors also motivated the practice.

42 U.S.C. § 2000e-2(m).

14

> On a claim in which an individual proves a violation under section 2000e-2(m) of this title and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court – (i) may grant declaratory relief . . . and attorney's fees . . .

42 U.S.C. § 2000e-5(g)(2)(B).

In light of the 1991 Amendments to the Civil Right Act of 1964, Bassett must simply present evidence from which a reasonable jury could infer that race was a factor in the decision to terminate her to avoid summary judgment.

The normal definition of discrimination is "differential treatment." *Babb v. Wilkie*, 589 U.S. 399, 405 (2020). *Murray v. UBS Securities, LLC,* 601 U.S. 23 (2024), stated, when interpreting the Sarbanes-Oxley Act, "an animus-like 'retaliatory intent' requirement is simply absent from the definition of the word 'discriminate.'" *Murray*, 601 U.S. at 34. *Murray* also cited a Title VII case, *Bostock v. Clayton County, Georgia,* 590 U.S. 644 (2020), for the proposition that "discriminate" means "[t]o make a difference in treatment or favor (of one as compared with others)." *Bostock,* 590 U.S. at 657. A simple test for discrimination is whether the plaintiff has shown that but-for a person's race, her treatment would have been different. *City of Los Angeles, Dept. of Water and Power v. Manhart*, 435 U.S. 702, 711 (1978).

*Bostock v. Clayton County, Georgia*, 590 U.S. 644, 658 (2020), holds that "an employer who intentionally treats a person worse because of sex – such as firing the

person for actions or attributes it would tolerate in an individual of another sex –

discriminates against that person in violation of Title VII." *Bostock*'s holding was

in the context of sexual orientation discrimination, but it clearly follows that if a

change in race would change the employment decision, then the employer has also

violated Title VII.

There is substantial evidence here that a change in race would have changed

the employment decision. WLBT's own attorney, an agent of the station, repeatedly

asked questions at depositions which implied that a black person's saying the phrase

at issue would be different from a white person's saying the same phrase. ROA.

625-630, 642.

Similarly, WLBT's corporate representative testified:

Q. All right. Is it racist for Snoop Dog to use the term fo shizzle my nizzle? Is that racist if he uses it?

MS. HODGES: Object to form. You can answer if you know.

A. Well, I don't know if it's - - I know that there are things that some people can say that are not considered to be inappropriate based on who they are and their background compared to other people. In today's world, that's the way it works.

Q. (Mr. Waide) Well, let's be more specific. Do you mean by that that there's some things that black people can say that white people can't say?

A. Absolutely.

ROA. 1026.

While no drawing of inferences is necessary here because Bassett's case is one of direct evidence, even if the district court had drawn inferences in favor of Bassett, then it would have found there is a jury issue as to whether Bassett's race motivated her firing.  Drawing inferences in non-movant's favor as required by *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000), a jury could infer that it is acceptable, according to WLBT, for a black person to use the term, "fo shizzle, my nizzle," but that it is not acceptable for a white person, such as Bassett, to use the same term.

Rather than crediting the direct evidence or accepting as true the evidence favoring non-movant given by WLBT's corporate representative as required by *Reeves*, 530 U.S. at 150, the district court incorrectly credited the version favoring the non-movant, which follows:

> Q.    Okay. And so far as you know—I mean, I know you didn't even know what the phrase meant yourself at the time, but so far as you know now is it offensive or—is it something that black people can't say or is it just something that white people can't say?
>
> A.    I think it depends on the circumstances and the situation. It's certainly not something you want to say on the air whether you're black or white, on our television station for sure.

ROA. 1133.

Here, the district court discredited or neglected to consider the straightforward admission of WLBT's corporate representative who responded with a resounding, "Absolutely" when asked whether there were things that black people can say but

17

white people cannot say. ROA. 1026. Instead, the district court itself erroneously drew inferences in favor of WLBT and made credibility determinations by choosing to accept the rehabilitated statement of WLBT's corporate representative. The district court substituted its judgment for that of the jury in deciding which version of WLBT's corporate representative's testimony to believe.

The district court relied on other testimony, favorable to the movant:

Q.    It was your earlier testimony that there's some things that black people might be permitted to say, but white people would not be permitted to say that would be appropriate for blacks but not appropriate for whites; am I correct?

. . .

A.    I made the statement that it doesn't matter if they're white or black on our television station, there are things that they can't say regardless of their race.

ROA. 1134.

In granting summary judgment, the district court improperly accepted as true those parts of WLBT's testimony that favored the movant, which is impermissible under *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133 (2000). *Reeves* holds the district court was required to "give credence to the evidence favoring the nonmovant." *Reeves*, 530 U.S. at 151. The district court can credit evidence of the moving party only if the jury is "required to believe" that evidence. There is no reason why the jury should be "required to believe" the self-serving testimony of WLBT itself. WLBT's corporate representative is not a "disinterested witness," such

that any uncontradictory testimony he gives must be accepted as true. *Reeves*, 530 U.S. at 150-151. According to *Reeves*, the district court must accept the evidence favoring the non-movant, which is that there are "absolutely" things that a black person can say, but which a white person, such as Bassett, cannot say. Such testimony is direct evidence from which a jury can find that Bassett's race motivated her termination. Additionally, even if this Court believes the evidence is not sufficient to be considered direct evidence, then at the least, a jury could have drawn a reasonable inference from that testimony that Bassett was fired because of her race.

*Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222 (5th Cir. 2015), is a case in which a lower court judge also credited a portion of a witness' testimony that was helpful to the moving party. This Court wrote:

> This approach is inconsistent with fundamental rules governing summary judgment. By choosing which testimony to credit and which to discard, "the court improperly 'weigh[ed] the evidence' and resolved disputed issues in favor of the moving party." *Tolan v. Cotton*, - U.S. - , 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895(2014) (per curiam) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)). While utilization of the *McDonnell Douglas* framework requires fact-intensive analysis, it does not alter basic summary judgment law, which must control and restrain the inquiry.

*Burton*, 798 F.3d 222, 236 (5th Cir. 2015).

WLBT's claim that it would have fired a black person for using "fo shizzle, my nizzle," must be disregarded. Edward H. Cooper, *Directions for Directed Verdicts: A Compass for Federal Courts*, 55 Minn. L. Rev. 903, 943 (1970), writes:

Likewise, in situations where a witness is called upon to testify to what would have been done if something else had not first occurred, the slope down into comfortable certainty that the favorable thing would have been done is so easy that a policy of free disbelief seems incontestable.

In this case, WLBT not only admitted that there are things which black people can say but which white people cannot say, but also accepted the black employees' understanding of Snoop Dogg's term, "fo shizzle, my nizzle," while rejecting the white employees' opinion of the meaning of the same term. WLBT relied on black employees' opinions, and rejected the opinions of white employees, including Bassett, that the term had no racist meaning.

WLBT's news director, Charles Jones, had actual knowledge of the alternative use of the term as meaning "my brother," since he investigated "fo shizzle, my nizzle" enough to know of its benign meaning. ROA. 833-834. Drawing inferences in the non-movant's favor, a jury could infer that accepting black employees' opinion of the meaning of the term over white employees' understanding of the meaning of the term is classic discrimination.

A jury was also not required to believe WLBT's claim that it could fire Bassett for legitimate reasons because her language might be harmful to the business. WLBT decided to enforce Plaintiff's noncompete agreement. A jury may thus infer that WLBT did not really believe Bassett's comment was harmful to the television business at all. Otherwise, WLBT would not need to enforce a noncompete. If

WLBT actually believed that Bassett's comment would hurt its business, the rational position for WLBT to take would have been to want her to work for a competitor.

A jury could infer there must be a discriminatory motive in firing Bassett because WLBT knew that Bassett is sensitive to and opposes racism. WLBT, for example, knew Bassett was "mortified" when she was told the term "grand mammy" was racially offensive to some people. ROA. 595. When Bassett was told that the word "grand mammy" was offensive, she immediately called Carmen Poe to apologize to her. ROA. 995-996.

Bassett was fired because of a race neutral phrase she used when promoting a black person's business. To Bassett it "made sense" to use the term attributable to Snoop Dogg because the station was promoting Snoop Dogg's new wine on the air. ROA. 629-630. A jury could infer that since Bassett was actually promoting Snoop Dogg's product, she was promoting, not degrading, a black person, and therefore, may infer that WLBT fired her because of her race, white. Bassett was certainly not behaving in a racist fashion.

A jury could find that WLBT knew the term "fo shizzle, my nizzle" has a non-racial connotation. A jury could infer that since WLBT chose the black employees' and black viewers' interpretation of the term, over white persons' interpretation of the same term, the station discriminated. WLBT had a choice as to which

interpretation to give to the phrase, and the station chose to utilize the interpretation given by the black persons.

" 'When I use a word,' Humpty Dumpty said in rather a scornful tone, 'it means just what I choose it to mean – neither more nor less.' " Lewis Carroll, *Through the Looking-Glass.* Just like Humpty Dumpty, WLBT chose to give the race neutral phrase "fo shizzle, my nizzle" a racial meaning. Had WLBT not been practicing race discrimination, it would have treated this race neutral phrase as race neutral, rather than brand it as a racist term, simply because black people claimed the term was racist.

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181 (2023), interpreted both the Equal Protection Clause of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964. As applied here, *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181 (2023), outlawed taking race into account in making college admission decisions. Justice Sonia Sotomayor summarized the Court's holding in her dissent, stating: "Today, the Court concludes that indifference to race is the only constitutionally permissible means to achieve racial equality in college admissions." *Students for Fair Admissions, Inc.*, 600 U.S. at 333 (Sotomayor, J., dissenting).

Title VI and Title VII are both parts of the Civil Rights Act of 1964. Thus, "indifference to race" is the only legally permissible means for making employment decisions.

In Bassett's case, taking evidence in the light most favorable to the non-movant as required by *Reeves*, and bearing in mind that "indifference to race" is the only permissible approach to an employment decision, the following facts would permit a reasonable jury to find race was a motivating factor in the decision:

a)    WLBT admitted at its corporate deposition that there are "absolutely" some words that blacks can use that whites cannot use;

b)    WLBT operates a media center, where it has an established policy of overwhelmingly preferring black applicants to white applicants;

c)    Bassett was an excellent long-term employee, and WLBT knew she had no racial bias based upon the opinions of viewers and her co-workers;

d)    WLBT's own attorney asked questions of Bassett implying it would be appropriate for a black person to use the race neutral term "fo shizzle, my nizzle" but not appropriate for a white person to use the same term;

e)    WLBT knew that Bassett could not have meant the term in a racist manner because she was promoting a black person's product; and

f)    WLBT accepted black persons' opinions of the meaning of a race neutral term over white persons' opinions of the meaning of the same term.

## II. THE DISTRICT COURT ERRED IN HOLDING THAT THE *MCDONNELL DOUGLAS* METHOD WAS THE EXCLUSIVE METHOD OF PROVING RACE DISCRIMINATION.

The district court wrote:

> The parties dispute the test that should apply. WLBT lays out the classic *McDonnell Douglas* framework used when a plaintiff relies on circumstantial evidence to prove discrimination. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000); *see* Def.'s Mem. [37] at 7–8. Bassett says there are other ways to prove a Title VII claim.

ROA. 1126-1127.

The district court then held that the evidence in Bassett's favor was not "direct evidence."[2] Therefore, the lower court used the *McDonnell Douglas* methodology and granted summary judgment. ROA. 1127-1128, 1143.

---

[2]  The district court oddly writes, "Bassett never claims that her case offers direct evidence of discrimination, but she relies on a quote from WLBT's 30(b)(6) deposition stating that there are 'some things that black people can say that white can't.'" ROA. 1127.

First, there is no reason for Bassett to have labeled any of her evidence as either "direct" or "circumstantial." It is settled law that a Title VII plaintiff may make a *prima-facie* case of discrimination using either direct or circumstantial evidence. *Portis v. First Nat'l Bank*, 34 F.3d 325, 328 (5th Cir. 1994). The standard for a motion for summary judgment does not hinge on whether the evidence offered by a plaintiff is direct or circumstantial. Instead, Federal Rule of Civil Procedure 56 makes clear that the simple question is whether there is no genuine issue as to any material fact. If there is, as in Bassett's case, a genuine issue as to any material fact, the motion for summary judgment must be denied.

Second, although Bassett did not specifically label any of her evidence as either "direct" or "circumstantial," the district court realized that the corporate representative's statement was certainly direct evidence. ROA. 1127. Caselaw is clear (and quoted by the district court) that direct evidence is simply that which "proves the fact of discriminatory animus." *Sandstad v. CB Richard Ellis, Inc.,* 309 F.3d 893, 897 (5th Cir. 2002). Additionally, this Court in *Etienne v. Spanish Lake Truck & Casino Plaza, LLC*, 778 F.3d 473, 476 (5th Cir. 2015) established a four (4) part test to determine what is direct evidence. The test applied in that case to remarks made in the workplace, but that test fits the comments made by WLBT's corporate representative in his deposition. The test is as follows: (1) Was the comment related to the person's protected characteristic? Here, Bassett's protected characteristic is race. Fortenberry's statement was directly related to Bassett's race, white, and the alleged inability for white people to use some

Initially, the district court erred in reverting to the *McDonnell Douglas* method simply because that court found the case presented only circumstantial and not direct evidence. The distinction between direct and circumstantial evidence is no longer viable. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003), recognized that in a mixed motive case, it is not necessary to have "direct evidence," and an instruction under 42 U.S.C. § 2000e-2(m), may be obtained by presenting "sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race . . . was a motivating factor . . . '"

*Costa* condemns drawing a distinction between direct and circumstantial evidence, holding:

> We have often acknowledged the utility of circumstantial evidence in discrimination cases. For instance, in *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), we recognized that evidence that a defendant's explanation for an employment practice is "unworthy of credence" is "one form of *circumstantial evidence* that is probative of intentional discrimination." Id. at 147, 120 S.Ct. 2097. (emphasis added).

> The reason for treating circumstantial and direct evidence alike is both clear and deep rooted: "Circumstantial evidence is not only sufficient, but also more certain, satisfying and persuasive than direct evidence."

---

phrases which black people can use. (2) Was the comment in proximate time to the challenged employment decision? Here, Fortenberry made the comment in a deposition after the employment decision, but his comment made clear that his thought process was the same at the time of Bassett's termination. (3) Was the comment made by an individual with authority over the challenged employment decision? Here, Fortenberry himself made the decision. ROA. 840, 957. (4)Was the comment related to the challenged employment decision? Here, the comment went to the heart of the decision: whether Bassett, a white person, could say "fo shizzle, my nizzle." *Etienne,* 778 F.3d at 476. Fortenberry admitted race was a motivating factor in the decision to terminate Bassett. Whether that evidence was labeled "direct" or "circumstantial" is of no consequence.

*Rogers v. Missouri Pacific R. Co.,* 352 U.S. 500, 508, n. 17, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957).

*Costa*, 539 U.S. 90, 99-100.

In light of *Costa*, the trial judge's finding that the *McDonnell Douglas* model must be used if the case involves circumstantial evidence is incorrect.

A *prima facie* case, plus the defendant's explanation being "unworthy of credence is simply <u>one</u> form of circumstantial evidence that is probative of intentional discrimination . . . " *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. at 147. (emphasis added). *Reeves* thus implies that the *McDonnell Douglas* methodology is not exclusive, but is only one form of circumstantial evidence upon which a plaintiff may rely.

Decades after *McDonnell Douglas* was decided, the United States Supreme Court held that discrimination may be proved by proof that the defendant would have made a different decision had it not been for the plaintiff's sex. If sex were one but-for cause of the decision, that is enough to trigger liability under Title VII. *Bostock v. Clayton County, Georgia*, 590 U.S. 644, 656 (2020). *Bostock* is analogous to this case. Here, a reasonable jury could find that Bassett's race, white, was one "but-for" cause of her being fired.

In the age discrimination context, this Court has already recognized that the plaintiff may prevail by showing that age was the more likely reason for the

employment decision.  *Rachid v. Jack In The Box, Inc*., 376 F.3d 305, 312 (5th Cir. 2004).

Since *Rachid* was an age discrimination case, the motivating factor test of causation in Title VII cases did not apply.  If applied by analogy to this Title VII case, *Rachid* would logically indicate that in a Title VII case, a plaintiff may prove her case not only through the *McDonnell Douglas* methodology, but also by showing that race was a motivating factor in the decision.

This interpretation is mandated by 42 U.S.C. § 2000e(m), which makes it unlawful to "discriminate on the basis of race."  The "starting point for . . . analysis is the statutory text  . . . [W]here . . . he words of the statute are unambiguous, the 'judicial inquiry is complete.' "  *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003).

Other circuits have already held that the *McDonnell Douglas* method is not the exclusive method of proving discrimination.  *Brandt v. Fitzpatrick*, 957 F.3d 67, 76 (1st Cir. 2020), held:  "But *McDonnell Douglas* didn't pave the only road to relief for a plaintiff alleging status-based discrimination under Title VII.  That's because a hirer's decision-making can violate the statute even if the plaintiff's race wasn't the single, 'true reason' for the final decision."

*Quigg v. Thomas County School Dist*., 814 F.3d 1227, 1238 (11th Cir. 2016), held:  "In light of this clear incongruity between the *McDonnell Douglas* framework

and mixed-motive claims, it is improper to use that framework to evaluate such claims at summary judgment."

*Bart v. Golub Corporation*, 96 F.4th 566, 567 (2nd Cir. 2024), held that a plaintiff may prevail "by adducing evidence that, even if the employer had mixed motives, the plaintiff's membership in a protected class was at least one motivating factor in the employer's adverse action."

The defendant's assumption, which the district court adopted, was that *McDonnell Douglas* standards must be met in all cases. That assumption has been rejected in the analogous case, *Patterson v. McLean Credit Union*, 491 U.S. 164, 187-88 (1989). In *Patterson*, the lower court held that the plaintiff could prove pretext only by proving that he was better qualified than the successful applicants for the job. *Patterson* held that proving the applicant is better qualified than the person who got the job is only one way of proving pretext and that there are certainly other ways to prove pretext. *Patterson,* 491 U.S. at 188. By analogy, there are other ways to prove discrimination in this case in addition to the *McDonnell Douglas* method.

In *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008), Judge (now Justice) Brett Kavanaugh, wrote:

> As the Supreme Court explained a generation ago in *Aikens*: "Where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant. The district court has before it all the

evidence it needs to decide whether the defendant intentionally discriminated against the plaintiff." …<u>The *Aikens* principle applies, moreover, to summary judgment as well as trial proceedings</u>.

(Emphasis added).

*Tynes v. Florida Department of Juvenile Justice*, 88 F.4th 939, 946 (11th Cir. 2023), held:

> . . . *McDonnell Douglas* is "only one method by which the plaintiff can prove discrimination by circumstantial evidence." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 n. 3 (11th Cir. 2005).

In *Hittle v. City of Stockton, California*, 604 U.S. ----, 145 S.Ct. 759 (2025), Justice Clarence Thomas dissented from a denial of a writ of *certiorari* because he believes the Court should consider overruling *McDonnell Douglas* outright.  In the course of his dissent, Justice Thomas (joined by Justice Gorsuch) pointed out that decisions indicating the *McDonnell Douglas* methodology is the exclusive way to prove discrimination are wrong.  Justice Thomas wrote:  "Some courts also fail to appreciate that *McDonnell Douglas* is necessarily underinclusive . . . satisfying *McDonnell Douglas* is not the only way or even the best way to prove a claim." *Hittle,* 145 S.Ct at 762 (2025)*. (Thomas, J., dissenting).

> Earlier in his dissent from the denial of *certiorari*, Justice Thomas explained:

> Because the *McDonnell Douglas* framework was designed for use in a bench trial, the language this Court has used to describe the framework does not neatly track plaintiff's summary-judgment task.

*Hittle*, 145 S.Ct. at 761.

Judge (now Justice) Neil Gorsuch, wrote in *Walton v. Powell*, 821 F.3d 1204, 1211 (10th Cir. 2016), that Title VII "doesn't ever require plaintiffs to establish more than mixed motives to prevail," and that "it may be that *McDonnell Douglas* is properly used only when the plaintiff alleges a 'single' unlawful motive – and not 'mixed motives' . . . "

That a plaintiff may establish discrimination, even though the reason the defendant gave for the decision was truthful, is also implicit in *McDonald v. Santa Fe Trail Transp. Co*., 427 U.S. 273 (1976). In that case, the defendant gave a truthful reason for the plaintiff's discharge, which was that the plaintiff was fired for theft, yet the Supreme Court held that there would be discrimination if the defendant fired a white employee for theft, but did not fire a black employee who had also committed theft. Had *McDonnell Douglas v. Green* been mechanically applied in *McDonald v. Santa Fe Trail Transp. Co*., the plaintiff would have lost for failure to rebut the defendant's articulated reason, which was that the plaintiff was fired for theft.

As pointed out in Argument I., *Bostock v. Clayton County, Georgia*, firmly established that *McDonnell Douglas* is not the exclusive method for proving liability under Title VII because it holds that "an employer who intentionally treats a person worse because of [a protective trait] - such as by firing a person for actions or attributes it would tolerate in an individual of [the opposite trait] - discriminates against that person in violation of Title VII." *Bostock*, 590 U.S. at 658. There is not

a hint in *Bostock* that this language is qualified by a requirement that plaintiff use *McDonnell Douglas* methodology if she establishes discrimination by showing the defendant has fired a person for actions or attributes it would tolerate in an individual of the opposite trait. *Bostock*, 590 U.S. at 658.

The error in holding that *McDonnell Douglas* is the exclusive method of proving discrimination is also the subject of law review articles.

Deborah A. Widiss in *Proving Discrimination by the Text*, 106 Minn. L. Rev. 353, 423-424 (2021), concludes:  "Under the statutory language, it should be irrelevant whether legitimate factors play a role in the decision, so long as a factfinder could conclude a proscribed factor made a difference in the outcome."

Timothy M. Tymkovich in *The Problem of Pretext*, 85 Denv. U. L. Rev. 503, 522 (2008), writes:  "The statute plainly states, 'an unlawful employment practice is established when the complaining party demonstrates that race . . . was a motivating factor for any employment practice, *even though other factors also motivated the practice*.' " (Emphasis in original).

Katie Eyer in *The Return of the Technical McDonnell Douglas Paradigm*, 94 Wash. L. Rev. 967, 969 (2019), writes that a mechanical application of *McDonnell Douglas* has often led some lower courts to make the wrong inquiry, stating:

> And indeed, scholars have argued for years that the *McDonnell Douglas* paradigm has become deeply flawed.  Relying on a hyper-technical version of the *McDonnell Douglas* paradigm, the lower courts routinely refuse to allow discrimination cases to reach a jury.  Such analyses

rarely focuses on the factual question of whether or not discrimination occurred, substituting technical rules for fair consideration of whether discrimination took place (or whether a reasonable jury could so conclude).

Sandra F. Sperino in *Flying Without a Statutory Basis: Why McDonnell Douglas is Not Justified by Any Statutory Construction Methodology*, 43 Hou. L. R, 743, 801 (2006), writes:

> In evaluating claims of discrimination under Title VII, courts should simply use the standard enunciated in the statutory text itself. In other words, when considering whether a plaintiff has presented enough evidence to proceed to trial or to prevail at trial, the decisionmaker would determine whether there is sufficient evidence to demonstrate "that race . . . was a motivating factor for any employment practice."

Rather than holding that *McDonnell Douglas* is the exclusive way to decide a discrimination case, the district court should have determined only whether there was sufficient evidence to demonstrate that race was a motivating factor in Bassett's termination.

There was evidence from which a jury could determine race was a motivating factor. Therefore, summary judgment should have been denied.

## III. ALTERNATIVELY, EVEN USING THE *MCDONNELL DOUGLAS* METHOD, A JURY ISSUE WAS PRESENTED.

Assuming that this Court rejects Bassett's argument and holds that the *McDonnell Douglas* method is the exclusive way to reach a jury, this Court should still hold that Bassett provided sufficient evidence to allow her a jury trial even under *McDonnell Douglas*.

32

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973), described the elements of the *prima facie* case as the following:

> (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainants qualifications.

Of course, showing that one belongs to a minority group is no longer part of the equation. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273 (1976); *Ames v. Ohio Department of Youth Services*, 605 U.S. 303 (2025).

Adjusting the *McDonnell Douglas* elements to the facts of this case, Bassett has met the *McDonnell Douglas* model. She has established a *prima facie* case because she has established that she, a white, high-performing employee, was fired, and WLBT continued to seek applicants and ultimately hired an applicant of the opposite race.

Under *McDonnell Douglas*, the burden then shifts to WLBT to rebut the presumption of discrimination by producing evidence that Bassett was rejected "for a legitimate, nondiscriminatory reason." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Here, WLBT contends that Bassett was fired for using offensive language.

There is an issue of material fact however, as to whether this reason was a nondiscriminatory reason. Bassett has produced substantial evidence that the reason was discriminatory because she has produced evidence that:

1)      WLBT admitted at deposition that using the phrase "fo shizzle, my nizzle" is an example of a phrase that black persons can use, but white persons cannot;

2)      WLBT relied upon the opinions of black persons, disregarding the opinions of white persons, as to the meaning of the phrase "fo shizzle, my nizzle;"

3)      WLBT operates a school in which it gives preference to black persons as potential newscasters; and

4)      WLBT utilized a phrase which is race neutral on its face, "fo shizzle, my nizzle," to fire Bassett on grounds that she used a racially offensive phrase.

Accordingly, there are issues of material fact as to whether WLBT has met even the *McDonnell Douglas* requirement of stating a "nondiscriminatory reason" for its decision.

WLBT will object to this analysis, because it will claim that in determining whether a *prima facie* case has been made or whether a nondiscriminatory reason has been assigned is a question for the judge, not for the jury. This analysis is wrong. *McDonnell Douglas* was providing an analysis for a judge to utilize in determining whether discrimination existed. However, at that time, the Civil Rights Act of 1991 had not been enacted. Only equitable relief was available. *Wilson v. Belmont Homes,*

*Inc.*, 970 F.2d 53, 55 (5th Cir. 1992); *Young v. City of Houston, Tex.*, 906 F.2d 177, 181 n. 3 (5th Cir. 1990).

*McDonnell Douglas* provided a method which a judge could use to make the ultimate decision of whether discrimination occurred. *McDonnell Douglas* was not providing guidance for a judge to use in determining whether summary judgment should be granted.

Bassett is entitled to a jury trial under the Civil Rights Act of 1991, 42 U.S.C. § 2000e(c). Furthermore, the Seventh Amendment requires a jury to decide this issue, since the Seventh Amendment requires a jury determination of all cases in which damages may be awarded. *See, e.g., Sec. & Exch. Comm'n v. Jarkesy*, 603 U.S. 109, 123-124 (2024). Accordingly, if this Court concludes that it must apply the *McDonnell Douglas* elements, then by virtue of the Seventh Amendment, the Court must allow the jury to decide whether WLBT's articulated reason was nondiscriminatory.

*Stelly v. Dep't of Pub. Safety & Corr. Louisiana State*, No. 24-30550, 2025 WL 2371031 *2 (5th Cir. Aug. 15, 2025), held that even under *McDonnell Douglas* in a race discrimination case, a plaintiff can prevail if she proves either the assigned reasons were false or that plaintiff's protected characteristic was another motivating factor in the decision. In this case, Bassett has produced substantial evidence that her race was a motivating factor in the decision. Thus, applying this circuit's

holdings, Bassett is entitled to a jury determination even if the *McDonnell Douglas* test is utilized.

## <u>CONCLUSION</u>

Summary judgment should not have been granted.  The holding of the district court should be reversed, and the case should be remanded for a trial on the merits.

RESPECTFULLY SUBMITTED, this the 3rd day of September, 2025.

BARBIE BASSETT, Plaintiff-Appellant

By:     */s/ Jim Waide*
        JIM WAIDE, MS Bar No. 6857
        waide@waidelaw.com
        RACHEL PIERCE WAIDE,
        MS Bar No. 100420
        rpierce@waidelaw.com
        YANCE FALKNER, MS Bar No. 106107
        yfalkner@waidelaw.com
        WAIDE & ASSOCIATES, P.A.
        Tupelo, MS 38804-3955
        Post Office Box 1357
        Tupelo, MS 38802-1357
        Telephone: (662) 842-7324
        Facsimile:  (662) 842-8056

        ATTORNEYS FOR PLAINTIFF-
        APPELLANT

## **CERTIFICATE OF SERVICE**

This will certify that undersigned counsel for Plaintiff-Appellant has this day

filed the above and foregoing **Brief of Appellant** with the Clerk of the Court,

utilizing this Court's electronic case data filing system (CM/ECF), which sent

notification of such filing to the following:

> **Melissa Kimberly Hodges**
> Ogletree Deakins, P.C.
> Suite 300
> 6410 Poplar Avenue
> International Place Tower II
> Memphis, TN 38119-0000
> Telephone: (901) 767-6160
> Facsimile: (901) 767-7411
> kim.hodges@ogletreedeakins.com

SO CERTIFIED, this the 3rd day of September, 2025.

_/s/ Jim Waide_
JIM WAIDE
Attorney for Plaintiff-Appellant

## **CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains <u>9,179</u> words, excluding the parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word, in 14-point Times New Roman font (except for footnotes, which are in 12-point Times New Roman font, as permitted by Fifth Circuit Rule 32.1).

3. The undersigned understands a material misrepresentation in completing this certificate or circumvention of the type-volume limits in Fed. R. App. P. 32(a)(7), the typeface requirements of Fed. R. App. P. 32(a)(5), or the type style requirements of Fed. R. App. P. 32(a)(6) may result in the Court's striking the brief and imposing sanctions against the person signing the brief.

SO CERTIFIED, this the 3rd day of September, 2025.

*/s/ Jim Waide*
JIM WAIDE
Attorney for Plaintiff-Appellant